## MacAndrews and Forbes Company, Appellee, v. Mechanical Manufacturing Company, Appellant.

### Gen. No. 38,097.

Opinion filed April 22, 1936. Rehearing denied May 5, 1936.

SAMUEL A. & LEONARD B. ETTELSON, of Chicago, for appellant; SAMUEL A. ETTELSON, ERWIN M. TREUSCH and CARL J. APPELL, all of Chicago, of counsel.

GANN, SECORD & STEAD, of Chicago, for appellee; GUY VAN SCHAICK, of Chicago, of counsel.

MR. PRESIDING JUSTICE HALL delivered the opinion of the court.

By this appeal, defendant seeks the reversal of a judgment against it for the sum of $37,426.10, and costs of suit. The cause was tried by the court without a jury.

The action is based upon the claim of plaintiff that defendant contracted to manufacture, furnish and deliver to plaintiff, a machine for spray drying licorice by a continuous operation; that by the terms of the contract entered into between the parties, there was both an implied and express warranty by defendant,

that the machine so to be furnished by it would be fit for the purpose for which it was intended; that a machine was manufactured by defendant and placed in plaintiff's factory at great cost to plaintiff, including moneys paid by it to defendant as a part of the purchase price of such machine, moneys spent by plaintiff in connection with the installation and alteration of such machine, and moneys spent in alteration of plaintiff's building in order that such machine might be installed in such building. It is plaintiff's contention that the machine furnished by defendant to plaintiff wholly failed to do the work for which it was intended, and the suit is brought to recover moneys paid out by it, together with damages it claims to have sustained by reason of defendant's alleged breach of contract.

Defendant does not claim that the machine furnished by it did the work for which it was intended, but insists that there was neither an express nor implied warranty that the machine would do such work; that the machine was a patented article, and that, therefore, under the provisions of the Uniform Sales Act, there was no implied warranty as to the fitness of the machine for any particular purpose, that plaintiff purchased the machine for experimental purposes, and that if it did not work, it was because of certain characteristics pertaining to licorice which prevented the machine's successful operation, and for which defendant could not be held responsible.

Prior to the execution of the original contract between the parties, there had been considerable experimentation on the part of defendant in an effort to perfect a machine which would meet the needs of the plaintiff, and there was a great amount of correspondence and talk between the parties on this subject. On September 8, 1925, plaintiff wrote defendant the following letter:

"Will you please have made up and mailed to us, three copies of formal contract, one of which is to be

returned to you with our signature when accepted, for one Stutzke Spray Dryer for use with licorice extract, capacity of 100 gallons per hour evaporation, using steam at 150 lbs. per square inch pressure, and electricity three phase, 60 cycle, 440 volts.

"Please state or include—

"(1) Price, terms, and delivery.

"(2) Guaranteed steam consumption in lbs. per lb. of evaporation.

"(3) Guaranteed electric consumption in k.w. hours per lb. of evaporation.

"(4) Provision or certificate from Hartford Steam Boiler Inspection and Insurance Co., approving all parts under boiler steam pressure to 200 lbs. per square inch.

"(5) Guarantee of overall yield or per cent of weight of dry solids delivered from machine to the weight furnished it.

"(6) Guaranteed evaporation in lbs. water per hour over 24 hr. period.

"(7) Statement of maximum density licorice solution that can be dried with your outfit.

"We will want to inspect your installation in operation that is in our vicinity if it is possible to do so, and we would like to have your contracts at hand by that time.

"As we have explained to your Mr. Hubbard, the cost of evaporation with your dryer is high, but there are certain factors that may induce us to go ahead with our installation. An inspection of one of your plants in commercial operation will be of great assistance to our executives in making their decision."

In reply to this letter, on September 19, 1925, defendant wrote plaintiff the following letter, which is referred to by both parties as the original contract between them:

"Replying further to your letter of the 8th, and following up ours of the 11th, our Engineering Depart-

ment has now gone over the details of the 100 gallon Stutzke Dryer to operate under 150 pounds steam pressure, to pass Hartford Steam Boiler Inspection and Insurance Company's inspection for 200 lbs. pressure per square inch. We quote you as follows:

"We propose to furnish one 100 gallons capacity Stutzke Patent Spray Dryer complete with fittings for operating consisting of the following items as shown on Drawing QD 530:

" 'A' One Drying Chamber of the proper size and design for the above capacity, to be made of 8 gauge black steel throughout and equipped with 4 double glass inspection doors, so designed as to open automatically from any undue internal pressure.

" 'B' One Heater, designed to withstand 200 lbs. steam pressure (gauge) to be made of flange steel throughout and to have 181 4" boiler tubes expanded and beaded into heads, also equipped with 2 double glass inspection doors, 1 at top and 1 at bottom, designed to open automatically from any undue pressure internally. Top of heater to have baffle or powder blower to prevent the deposit of powder on top of tube sheet. We to furnish 1–0–200 lbs. 6" dial steam gauge. One spring loaded pop Safety Valve. One steam inlet gate valve and one condensation cut-off valve of the proper size with this heater.

" 'C' One dry product collector to be made of 8 gauge black steel designed to give the maximum collection possible. All surfaces on inside of collector to be smooth. At the bottom of this collector there shall be a helicoid conveyor to remove powder collected. This conveyor to be fitted with a 24" face pulley for driving.

" 'D' One horizontal circulating fan at top. This fan is to be 'B. F. Sturtevant Co. 's' Belt Driven slow speed planing mill exhaust fan. The housing for this fan to be substantially constructed and air tight.

" 'E' One vertical belt driven circulating fan at bottom. The wheel for this fan is to be 'B. F. Sturtevant Co. 's' slow speed planing mill exhaust fan wheel. This housing is to be our own special design of heavy construction with extra heavy shaft and thrust bearing with all seams welded and air tight.

" 'F' One B. F. Sturtevant Co. 's' Belt Driven monogram type exhauster to handle excess vapors.

" 'G' Seven patented Spray Nozzles with necessary piping and fittings including one pressure regulating valve, one screen and 1–0–100 lb. 6″ dial steam gauge.

" 'H' Two 100° to 500° F. Angle thermometers with 9″ scale.

" 'I' One super-heater to furnish steam for atomizers. This super-heater to be made of heavy material to withstand 200 lbs. pressure of the circulating steam used as a heating medium, and to have necessary connections and fittings for connecting to atomizers.

" 'J' One Frame complete to be of a substantial design capable of carrying the above apparatus without undue vibration or deflection.

"All work to be done in a neat and workmanlike manner and guaranteed against flaws and defects.

"All outside surfaces to be painted with a good grade of paint and precautions taken to prevent rusting on inside.

"Customer to furnish all motors for driving, unless otherwise provided for, the circulating fans will require 2–7½ H. P. 1150 R. P. M. motors. The monogram exhauster will require a ½ H. P. 1800 R. P. M. motor, and the conveyor a ½ H. P. 1200 R. P. M. motor.

"All power transmissions, motor mounting platforms, belting, ladders, foundations and anchor bolts to be furnished by the customer.

"Customer to furnish feed tank, pump, and necessary piping to atomizers and also piping for steam lines to heater and super-heater.

"The entire unit including fans, ducts, and conveyors to be covered with a 2½″ coating of asbestos; this is to be furnished by customer, unless otherwise provided for.

"Price f. o. b. cars, our shops, Union Stock Yards, Chicago, with carload rate of freight allowed to Camden, N. J. $18,750.00.

"Shipment can be made in from 60 to 90 days from receipt of your order.

"Under date of March 3d, we had the pleasure of quoting you on a similar outfit, but rated only up to 150 lbs. steam pressure; and considering the negotiations between us since that time and the fact that we haven't any of these dryers operating on your class of product, and particularly none of them operating close to Philadelphia, we have decided to stand by the special agreement mentioned in the 6th paragraph of our letter of March 3d, with this exception:

"Instead of making the allowance of $3,750.00 which we made and which would net you $15,000.00 for the machine, we are obliged to take into consideration the additional cost of labor and material required in building the present machine to stand 200 lbs. pressure, and will accordingly make you a special allowance of $2,150.00, this special allowance being for prompt acceptance, subject to withdrawal at our option at any time before the order reaches us.

"We are enclosing you a blueprint of our Drawing QD 530 showing the general construction of the dryer.

"Taking up now the seven points outlined in your letter; the above will serve as a reply to No. 1. On the balance, we furnish you the following information:

"No. 2. The steam consumption of this machine will be 1⅓ lbs. per pound of liquid sprayed.

"No. 3. The electrical consumption will be .015 K. W. per pound of liquid sprayed, based on liquid weighing 9½ lbs. per gallon. This covers all motors

on the machine proper, but does not include motor for the liquid feed pump.

"No. 4. We will furnish certificate of inspection for 200 pounds pressure per square inch, from the Hartford Steam Boiler Inspection and Insurance Company.

"No. 5. We guarantee the losses will not exceed three percent (3%) of the total yield when machine is handled according to our instructions. This may be slightly higher at the time of starting up, but only until the interior surface is covered with the powder that will naturally accumulate on any surface.

"No. 6. This machine is designed for the evaporation of 100 gallons of liquid per hour irrespective of the amount of solids contained therein, and we will guarantee 100 gallons of water evaporation per hour if no solids are present, and 100 gallons of liquid evaporation containing solids from 0 to 40%.

"No. 7. We have found from various tests that a density of 18° Baume works best in our atomizer.

"If you are prepared to proceed with this matter at the present time, and should desire information on any point which we have not covered, we wish you would please write or wire us at our expense, and the writer will call on you prepared to take up such details.

"Right now we are in position to give you most excellent service on this, and are looking forward to your prompt acceptance of this proposal, which we assure you will be very much appreciated.

"The Mechanical Manufacturing Company grants to MacAndrews and Forbes Company exclusive right to the use of the Stutzke Dryer for drying licorice for tobacco products." The proposition so submitted to plaintiff was formally accepted by it in writing on November 5, 1925.

The plaintiff is a New Jersey corporation, with its place of business located at Camden, in that State,

where it maintains a large manufacturing plant, and is engaged in the business of manufacturing licorice paste, largely used in the manufacture of commercial tobacco. Prior to the times in question, it had been experimenting with various methods used in drying licorice extract into powder, and in connection with its experimenting it was brought into contact with one Stutzke, who had been experimenting with and perfecting appliances for the spray drying of various organic substances, such as yeast, malt, starch, etc., and who had taken out various patents in connection therewith. About 1921, Roland M. Bickerstaff, Jr., chief engineer, and one of the officers of the plaintiff company, was brought into contact with Stutzke, who had installed a ''spray dryer'' for use in drying yeast, and at that time these two persons discussed the question of the spray drying of licorice. In 1923 the defendant company employed Stutzke to take charge of the manufacturing and sale of steam spray dryers. Following this, there was some correspondence between the parties to this action, with reference to a spray dryer, and in the year 1924, Bickerstaff came to Chicago to witness a test of this spray dryer, with the object of using such a machine to extract the moisture from the licorice. The correspondence and experimentation finally resulted in the submission by defendants to plaintiff of the contract dated September 19, 1925, already referred to. In the month of December, 1925, the terms of payment were agreed to between the parties, and thereafter, the machine was installed in plaintiff's building, plaintiff, in the meantime, having altered its building in order to accommodate the machine. On June 6, 1926, plaintiff paid defendant the sum of $8,300 as part of the purchase price of this machine, and on August 11, 1926, it paid an additional sum of $4,150. The various amounts paid out by plaintiff and the amount of damage alleged to have been sustained by

it, are not questioned. After experimenting with the machine for some considerable period, it was determined that it would not perform the service for which it was intended, and on April 17, 1929, plaintiff served notice on the defendant that June 1, 1929, would be the limit of time given by plaintiff to defendant to complete the machine so that it would work. At that time, defendant asked for a month's extension, and said that a further change would cause the machine to work properly, which extension was granted. An effort was made by defendant to cause the machine to operate, which did not succeed, and defendant then asked for further time in which to make further alterations, which request was granted by the plaintiff, and they thereupon entered into a further agreement submitted by defendant on December 12, 1929, and ratified and approved by plaintiff on December 19, 1929, which recites, among other things, that

"Whereas, the parties hereto have heretofore entered into a contract with reference to a Stutzke Spray Dryer *for use in drying licorice;* and

"Whereas, a dispute has arisen between the parties concerning their rights under said contract; and

"Whereas, the First Party is willing to make certain changes in the construction of said Spray Dryer, subject to the terms and conditions hereinafter set forth; Now, therefore,

"1 The first party agrees to make such changes in the construction of said proposed Dryer as its engineers will think advisable, without liability of any kind or nature to the said second party unless the Dryer as finally completed with the aid of such changes shall prove satisfactory to the second party. In no event shall the first party be under obligation to restore the Dryer to its present condition. If the said proposed Dryer after the completion of such changes is satisfactory to the second party, then the latter will

pay for said changes the sum of Five Thousand Dollars ($5,000.00) which is estimated as the cost of making the changes proposed by the first party. To the extent that the second party may from time to time in the progress of such changes furnish labor and/or materials to the first party, at the request of first party, the latter will reimburse the second party at cost each thirty days promptly upon presentation of bills by the second party.

"2 The first party will not be responsible for any injury or damage to any person and/or property, including loss of human life, arising directly or indirectly from, or in connection with, the reconstruction or operation of said Dryer, and the second party will hold the first party harmless from any and all loss or damage from such injury, damage or death, excepting the injury or death of the first party's employees, and excepting also that the first party assumes all risk as respects injury or damage to the Dryer itself pending the completion of said changes.

"3 The making of any and all changes and/or modifications by the first party pursuant to this present agreement shall be without prejudice to the rights of either party under the original contract above referred to and shall not be construed as a waiver of any rights of either party, nor as an admission of any rights of either party against the other.

"In Witness Whereof, the undersigned have set their hands hereto the day and year first above written.

"THE MECHANICAL MANUFACTURING COMPANY
By (Signed) J. W. Hubbard
Vice-Prest.
MACANDREWS & FORBES COMPANY
By (Signed) W. L. Geddes, Prest."

As stated, defendant insists that there was no expressed warranty that the machine would do the work for which it was intended. In the letter of Septem-

ber 8, 1925, plaintiff asks defendant to mail it "copies of formal contract . . . for one Stutzke Spray Dryer for use with licorice extract, capacity 100 gallons per hour evaporation, using steam at 150 lbs. per square inch pressure. . . . Please state or include—(1) Price, terms, and delivery. . . . (6) Guaranteed evaporation in lbs. water per hour over 24 hr. period. . . . As we have explained to your Mr. Hubbard, the cost of evaporation with your dryer is high, but there are certain factors that may induce us to go ahead with our installation." In answer to this letter, the letter of September 19, 1925, referred to as the contract between the parties, was written and contains, among other things, the following: "We propose to furnish one 100 gallons capacity Stutzke Patent Spray Dryer complete with fittings for operating consisting of the following:" (Then follows various specifications concerning the proposed machine, together with price to be paid, as shown by the copy already referred to.) This so-called contract contains the further recital: "The Mechanical Manufacturing Company grants to MacAndrews and Forbes Company exclusive right to the use of the Stutzke Dryer for drying licorice for tobacco products." The supplemental contract dated December 12, 1929, and approved December 19, 1929, contains the following, among other things: "Whereas the parties hereto have theretofore entered into a contract with reference to the Stutzke Spray Dryer for use in drying licorice, . . . and whereas the first party is willing to make certain changes in the said Spray Dryer, subject to the terms and conditions hereinafter set forth; Now, therefore, The first party agrees to make such changes in the construction of said proposed Dryer as its engineers will think advisable, without liability of any kind or nature to the said second party, unless the Dryer as finally completed with the aid of such changes, shall prove satisfactory to the second party. . . . If the said proposed Dryer, after

the completion of such changes, is satisfactory to the second party, then the latter will pay for said changes the sum of Five Thousand Dollars ($5,000.00) which is estimated as the cost of making the changes proposed by the first party. To the extent that the second party may from time to time in the progress of such changes labor and/or materials to the first party, at the request of the first party, the latter will reimburse the second party at cost each thirty days promptly upon presentation of bills by the second party.''

In *Kansas City Bolt & Nut Co. v. Rodd,* 220 Fed. 750, a manufacturer of bolts and nuts ordered from the manufacturer thereof, certain automatic nut tapping machines, to be manufactured for plaintiff. The machines were received by the purchaser, and some of them paid for. The purchaser of the machines brought suit for damages for breach of an alleged warranty that the machines would do good work, and were fit for the purpose for which they were purchased. Liability was denied, and a counterclaim was filed by the manufacturer, defendant, for a balance alleged to have been due. Defendant recovered, and an appeal was taken from the judgment in favor of defendant, which judgment was reversed and the cause remanded. It was insisted by the plaintiff that the machines purchased did not do the work for which they were intended, and in the trial of the case, the court instructed the jury to the following effect, as stated by the court in its opinion:

''The jury was instructed that defendant did not warrant 'that these machines were fit for *any particular purpose,* or for tapping *any special kind* of nuts,' and that plaintiff could recover only by showing that defects existed in the machines 'which rendered them unsuitable to perform *the ordinary work* which Rodd's automatic nut tappers are *made to do* in automatically and commercially tapping the *ordinary nuts sold in the trade.'* (Italics ours.)'' The court there held that

this instruction was erroneous, and cited the case of *Dushane v. Benedict,* 120 U. S. 630, page 636, where the court said, among other things:

" 'When a dealer contracts to sell goods which he deals in, to be applied to a particular purpose, and the buyer has no opportunity to inspect them before delivery, there is an implied warranty that they shall be reasonably fit for that purpose.'

"And, as expressed in *Jones v. Just,* L. R. 3 Q. B. 197 (which case was cited with approval in *Dushane v. Benedict*):

" 'It must be taken as established that on the sale of goods by a manufacturer or dealer, to be applied to a particular purpose, it is a term in the contract that they shall reasonably answer that purpose, and that on the sale of an article by a manufacturer to a vendee who has not had an' opportunity of inspecting it during the manufacture, that it shall be reasonably fit for use or shall be merchantable, as the case may be.' "

In *Lidgerwood Mfg. Co. v. Robinson & Son Contracting Co.,* 183 Ill. App. 431, plaintiff sold to defendant a Lidgerwood-Crawford Bucket Excavator, which it was engaged in manufacturing. In its opinion, the court recites that the Lidgerwood Company exhibited to a representative of the defendant certain excavating machines, which were partially completed, and of the character afterwards sold to the defendant. The machines purchased by defendant, however, at that time, were yet to be constructed. After this representative had gone through the plaintiff's shop and conversed with representatives of the plaintiff regarding the machines to be purchased by defendant, plaintiff submitted a proposal to defendant, very much in the manner in which the so-called contract in this case was submitted to the defendant here, containing certain specifications of the machine which it proposed to construct for the defendant. This proposal contained the following recital, among other things:

"It is expressly agreed that there are no promises, agreements or understandings outside of this contract, and that no agent or salesman has any authority to obligate the Lidgerwood Manufacturing Company by any terms, stipulations or conditions not herein expressed."

It was claimed by the defendant in that case that the machines purchased did not do the work for which they were intended. Plaintiff insisted that there was no implied or express warranty that they would do such work. In reversing the judgment, this court said:

"The evidence discloses that appellant was desirous of purchasing an excavator and went to Chicago and called upon appellee for that purpose; that appellee exhibited to him blue prints of the several parts of the machine and also exhibited to him some of the machines that were partially erected, and that at the conclusion of their examination appellee made the proposition which was offered in evidence and that appellant accepted this proposition.

"Appellant offered to show that before it entered into the contract, it advised the appellee of the purpose for which it was purchasing these machines, in other words, that it wanted the machines to excavate a diversion canal and that appellant also offered to prove that appellee exhibited to its agents, at the same time, a photograph showing a completed machine ready for work, and it was stated by counsel, at the time that it was offered, not for the purpose of changing the terms of the contract but for the purpose of putting the court in the position occupied by the parties at the time the agreement was entered into; but the court refused this testimony and we think this refusal was error. It did not tend to vary the terms of the contract. There is no doubt about the proposition that parol evidence cannot be offered for the purpose of in any manner changing or varying the terms of a written contract, but as the design and intention of the

parties in the making of the contract must be determined we think there is no doubt that the surroundings and circumstances under which the contract was entered into is proper. *Thomas v. Wiggers,* 41 Ill. 470. In the case of *Robinson v. Stow,* 39 Ill. 572, it is said, where the construction of a written contract was before the court that: 'The intention of the parties, it is true, must govern; but the experience of human affairs teaches courts that this intention is not to be sought merely in the apparent meaning of the language used, but this language may be enlarged or limited by reference to the circumstances surrounding the parties and the objects they evidently had in view. It often happens that a particular clause in an instrument is made to bear a meaning quite inconsistent with the natural import of the terms used by reference to the entire language and general scope of the contract. "The judges," says Lord Hale, "ought to be curious and subtle to invent reasons and means to make acts effectual according to the just intent of the parties; they will not, therefore, cavil about the propriety of words, when the intent of the parties appears, but will rather apply the words to fulfill the intent than destroy the intent by reason of the insufficiency of the words." ' " See also *Bird & Son v. Guarantee Const. Co.,* 295 Fed. 451.

In the instant case, as in *Lidgerwood v. Robinson, supra,* the machine to be delivered to plaintiff was to be especially manufactured by defendant, and the character of the machine to be manufactured, and the special purpose for which it was to be used, is expressed in great detail in the contract, and we are of the opinion that whether the processes of drying materials were patented or not, is of no consequence. From a reading of the original contract between the parties, the supplemental contract entered into between them, and from all the circumstances shown by the evidence in the case, we can arrive at no other conclusion than

that there was an express warranty on the part of the defendant that the machine, when installed in plaintiff's factory, would do the work for which it was intended.

Defendant claims that the court admitted incompetent evidence, and that for that reason, the judgment should be reversed. The trial was by the court without a jury. In *Radtke v. People,* 171 Ill. App. 462, this court said:

"We know of no rule of law that a court, on a hearing without a jury, is required to consider, in the determination of the issues, immaterial and incompetent evidence, however the same may have been admitted in the case. On the contrary the rule is that, on a trial by the court without a jury, no improper or incompetent evidence will be presumed by a reviewing court to have influenced the court in reaching a decision, where there is sufficient proper evidence to justify the judgment. *Merchants' Despatch v. Joesting,* 89 Ill. 152; *Kreiling v. Nortrup,* 215 Ill. 195; *Pratt v. Davis,* 224 Ill. 300. There are also many Appellate Court decisions to the same effect."

We are of the opinion, however, that there was ample evidence in the record, outside of any evidence which the defendant claims was incompetent, to justify the court in finding for the plaintiff, and that even though incompetent and immaterial evidence might have been erroneously received, such error would not justify a reversal of the judgment.

It is also claimed that the action is barred by the statute of limitations, for the reason that plaintiff's cause of action, if any, accrued more than five years prior to the bringing of the action. As to this question, we call attention to the fact that the declaration in this cause was filed on August 13, 1932. Under the original contract, as heretofore noted, defendant was endeavoring to produce a machine that would serve plaintiff's needs, and in May, 1929, plaintiff notified the defend-

ant that June 1, 1929, would be the limit of time given by plaintiff to defendant to complete the machine so that it would work, and as already noted, they then entered into a supplemental contract dated December 12, 1929, and ratified and approved by plaintiff on December 19, 1929. This was approximately three years prior to the beginning of the suit. We are of the opinion that the claim that the statute of limitations had run is without merit.

In view of the fact, as already stated, that the machine would not do the work for which it was intended, and that there is no question raised by defendant as to the amount of plaintiff's damages as found by the court, the judgment should be, and it is, affirmed.

*Affirmed.*

HEBEL, J., and DENIS E. SULLIVAN, J., concur.